Original Decision Mailed:                          Redesignation Mailed:

September 6, 2022                                    January 3, 2024


UNITED STATES PATENT AND TRADEMARK OFFICE

____

Trademark Trial and Appeal Board

____

*Laverne John Andrusiek*

*v.*

*Cosmic Crusaders LLC and Lewis J. Davidson*

____

Cancellation No. 92064830

____

Michael P. Matesky, II of Matesky Law PLLC, for Laverne John Andrusiek.

Joseph J. Weissman of Johnson Pope Boker Ruppel & Burns LLP,
    for Cosmic Crusaders LLC and Lewis Davidson.

____

By the Board:

The Board has chosen to redesignate the decision that issued on September 6, 2022 as a precedent. A copy of the decision, bearing such designation, is attached. The decision that issued on September 6, 2022 is also corrected as follows: page 1 "Louis" has been changed to "Lewis."

# # # #

THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing: July 22, 2021                    Mailed: September 6, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*Laverne John Andrusiek*

*v.*

*Cosmic Crusaders LLC and Lewis J. Davidson*

———

Cancellation No. 92064830

———

Michael P. Matesky, II of Matesky Law PLLC, for Laverne John Andrusiek.

Joseph J. Weissman of Johnson Pope Boker Ruppel & Burns LLP,
    for Cosmic Crusaders LLC and Lewis Davidson.

———

Before Wolfson, Lynch, and Larkin,
    Administrative Trademark Judges.

Opinion by Wolfson, Administrative Trademark Judge:

On October 25, 2021, the Board acknowledged the assignment from Cosmic Crusaders LLC (Cosmic Crusaders or Respondent) to Lewis J. Davidson (Davidson) of Registration No. 4782920 for the mark CAPTAIN CANNABIS (standard characters) for "comic books" in International Class 16 that is at issue in this case.[1]

---

[1] The assignment was recorded in the United States Patent and Trademark Office ("USPTO") on August 6, 2021 under Reel/Frame 7387/0773. The assignment identified Cosmic Crusaders as the assignor and as 'an administratively dissolved Florida limited liability company;' Cosmic Crusaders was dissolved by the state of Florida on September 25, 2015,

The Board sua sponte joined Davidson as a party defendant, noted that despite the prior assignment of the registration to Davidson, Cosmic Crusaders had filed a Declaration of Use in its own name under Trademark Act Section 8, 15 U.S.C. § 1058, and suspended proceedings pending the USPTO's review and acceptance of the Declaration. 64 TTABVUE 1-2. The USPTO accepted the Declaration on May 26, 2022. Accordingly, proceedings herein are resumed and the case is ready for decision.

## I.     Background

Laverne John Andrusiek (Petitioner) petitioned to cancel the involved registration for the mark CAPTAIN CANNABIS under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Davidson's use of the mark was likely to cause confusion with Petitioner's alleged prior use on comic books of the identical mark CAPTAIN CANNABIS.[2]

---

about 2 months after Registration No. 4782920 issued on July 28, 2015. Section 8 declaration filed July 28, 2021. As noted below, Davidson has been substituted into the case in place of Cosmic Crusaders as the party in the position of defendant, but we will refer in this opinion to Cosmic Crusaders as the "Respondent" because Cosmic Crusaders answered the petition for cancellation, filed the brief of the party in the position of defendant, and appeared through counsel at the oral hearing, even though, as discussed below, Davidson claimed to have created and used the registered mark personally.

[2] Petitioner also claimed that Cosmic Crusaders committed fraud in the execution of its April 2, 2014 application that matured into the involved registration; that Cosmic Crusaders did not make use of its mark prior to the application filing date; that any use Cosmic Crusaders may have made was unlawful; and that the specimen ultimately accepted by the USPTO prior to issuance of the involved registration was not in use prior to the filing date of Cosmic Crusaders' use-based application. 9 TTABVUE 47-55. Petitioner pursued these claims at trial.

Additionally, Petitioner argued in his trial brief that Respondent' mark fails to function as a mark because it is merely 'the title of a single comic book issue." 43 TTABVUE 6. Petitioner did not plead as a basis for cancellation that the mark fails to function as a mark because it is merely the title of a single work, nor did the parties try the issue by consent; accordingly, we do not consider the claim. In addition, while Petitioner argues in his trial brief that Respondent has abandoned the mark, there is no pleading of abandonment and therefore we

In its Answer, Cosmic Crusaders denied the salient allegations of the Petition to Cancel, and asserted that Petitioner abandoned any rights he may have had prior to Respondent's priority date. However, because Respondent failed to pursue the affirmative defense of abandonment at trial, it is deemed waived and has been given no consideration.[3] *See Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.,* 107 USPQ2d 1750, 1753 n.6 (TTAB 2013), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014). Moreover, the parties agree that the marks are confusingly similar, and as discussed more fully below, Petitioner only has to prove priority of use at common law to prevail on its claim under Section 2(d).

---

will not entertain that claim. *Syngenta Crop Prot. Inc. v. Bio-Chek LLC*, 90 USPQ2d 1112, 1115 n.3 (TTAB 2009); TBMP § 314 ("A party may not rely on an unpleaded claim.").

[3] Respondent's statement, in a footnote to its brief at 47 TTABVUE 22, that Petitioner "admitted" it did not use its mark for 20 years, and that this "raises a presumption of abandonment, which Petitioner cannot possibly rebut" is both a mischaracterization of any statement Petitioner may have made, and inadequate as proof that Petitioner's common law mark has been abandoned. Even if Respondent's statement is true, the 20-year period of time as characterized by Respondent comes "between the late 1970s an [sic] 1999." If Respondent had provided evidence of Petitioner's alleged abandonment prior to 1999, which it did not, such evidence would have no bearing on any subsequent use that Petitioner could prove it made prior to Respondent's date of first use. "[I]f a challenger's date of first use is later than the resumed use of the party alleged to have abandoned the trademark, then the issue of possible abandonment is irrelevant to the question of priority." 3 McCarthy on Trademarks and Unfair Competition § 17:3 (5th ed.); *see also Income Tax Serv. Co. v. Fountain*, 475 F.2d 655, 177 USPQ 388, 389 (CCPA 1973) (abandonment by registrant is irrelevant where its first use after alleged abandonment is prior to petitioner's first use); *W. Fla Seafood Inc. v. Jet Rests. Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1666 (Fed. Cir. 1994) (a party asserting abandonment as a defense to a prior use assertion "bears at a minimum a burden of coming forth with some evidence of abandonment"), *quoted in Exec. Coach Builders, Inc. v. SPV Coach Co.*, 123 USPQ2d 1175, 1181 (TTAB 2017).

## II.    Evidentiary Objection

During his rebuttal period, Petitioner filed a rebuttal declaration of Laverne Andrusiek (39 TTABVUE at 3-142);[4] a rebuttal declaration of Michael P. Matesky, II (39 TTABVUE at 143-149); and a rebuttal Notice of Reliance (37 TTABVUE at 2-18).

Respondent objected to Petitioner's rebuttal evidence as improper on the ground that "Petitioner utilized his 'rebuttal' testimonial period simply as a second bite at presenting his evidence in chief." 47 TTABVUE 12. Petitioner responded that the material was introduced to rebut Respondent's claim that it is the senior user of the mark: "Davidson did not solely testify regarding his own claimed first use dates. Rather, by claiming to be the 'senior user,' he necessarily claimed to have begun use of the CAPTAIN CANNABIS mark before Petitioner. . . . Petitioner is therefore entitled to submit evidence rebutting that claim." 51 TTABVUE 10. In other words, Petitioner contends that the evidence he presented during his main testimony period was meant to demonstrate his priority vis-à-vis Davidson, and that it was not until Davidson asserted his right to rely on the prior use by Cosmic Crusaders did it become necessary for Petitioner to present evidence of first use prior to that of Cosmic Crusaders.

"It is axiomatic that rebuttal testimony may be used only to rebut evidence offered by the defendant." *Life Zone Inc. v. Middleman Grp. Inc.*, 87 USPQ2d 1953, 1958 (TTAB 2008) (citing *Wet Seal Inc. v. FD Mgmt. Inc.*, 82 USPQ2d 1629 (TTAB 2007); *Rowell Labs., Inc. v. Can. Packers Inc.*, 215 USPQ 523, 525 n.2 (TTAB 1982)

---

[4] 39 TTABVUE is a corrected resubmission of 36 TTABVUE.

("material intended to buttress petitioner's case-in-chief ... constituted improper rebuttal"). With the aforementioned principle in mind, we find that the bulk of Andrusiek's rebuttal testimony and exhibits, the Matesky declaration and exhibits, and the evidence submitted under the rebuttal Notice of Reliance should have been introduced as part of Petitioner's case-in-chief. Inasmuch as the petition was filed against Cosmic Crusaders initially, it is reasonable to impose upon Petitioner a duty to present whatever evidence he had demonstrating his use prior to any use by that entity as part of his main trial evidence.

The only proper rebuttal evidence consists of the averments in Petitioner's rebuttal declaration that directly rebut certain statements made by Davidson in his testimony declaration, namely, that "No character named Captain Cannabis appears in the comic book. In fact, the name or term 'Captain Cannabis' appears nowhere in the comic book story." 17 TTABVUE 4. Accordingly, we admit and have considered the following testimony from the Andrusiek rebuttal declaration and related Exhibit 5:

> 18. In 2006, I published a new issue of the Captain Cannabis comic series, titled "420" (the "420/CAPTAIN CANNABIS" comic book). True and correct copies of the front cover, editorial page, and back cover of the 420/CAPTAIN CANNABIS comic book are attached hereto as Exhibit 5.
>
> 19. Like all other issues in the CAPTAIN CANNABIS series, the 420/CAPTAIN CANNABIS comic book tells the story of Halburt Lighter, the alter ego of superhero Captain Cannabis.
>
> 20. The 420/CAPTAIN CANNABIS comic book displays the Captain Cannabis Leaf Design Mark in the upper left hand corner of the front cover.

> 21. The editorial page of the 420/CAPTAIN CANNABIS comic book features the Captain Cannabis character artwork, and both the editorial page and back cover use the CAPTAIN CANNABIS trademark to inform readers that the 420/CAPTAIN CANNABIS comic book is part of the same "CAPTAIN CANNABIS" series and story that I began publishing decades earlier.

39 TTABVUE 5-6; Exhibit 5, 39 TTABVUE 26-29.

In all other respects, Respondent's objection to Petitioner's rebuttal evidence is sustained and the evidence has been given no consideration. *See, e.g., Osage Oil & Transp., Inc. v. Standard Oil Co.*, 226 USPQ 905, 907 n.10 (TTAB 1985), *rev'd on other grounds*, 10 USPQ2d 1554 (N.D. Okla. 1988) ("In view of the absence of a period for rebuttal by respondent, and since priority of rights was a crucial issue joined by the pleadings, it was incumbent on petitioner to anticipate that respondent would support its claimed prior rights both by evidence relating to petitioner's date of first use as well as its own."); *Am. Meat Inst. v. Horace W. Longacre, Inc.*, 211 USPQ 712, 719 (TTAB 1981) ("[i]t is the general rule that a party plaintiff may in his case on rebuttal introduce facts and witnesses appropriate to deny, explain, or otherwise discredit the facts and witnesses adduced by the opponent, but not any facts or witnesses which might appropriately have been introduced during its case- in-chief to sustain its pleading); *Gen. Elec. Co. v. Graham Magnetics Inc.*, 197 USPQ 690, 692 n.5 (TTAB 1977) (rebuttal testimony and evidence is intended to be limited to denials, refutations or explanations of defendant's testimony and evidence).

## III.  The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the challenged registration and its application file history. In

addition, and in light of our above evidentiary rulings, the record includes the following:

### A. Petitioner's Evidence

- Affidavit of Laverne John Andrusiek, including exhibits, 11 TTABVUE 6-95;
- Affidavit of Tom Edgar, site administrator of Francis Ford Coppola's American Zoetrope story development website, including an exhibit, 11 TTABVUE 2-4;
- Affidavit of Jim McPherson, self-identified as Publisher of Phantacea Publications, 11 TTABVUE 79;
- Portions of the Andrusiek rebuttal declaration, 39 TTABVUE 5-6 and Exhibit 5, 39 TTABVUE 26-29;
- Notice of Reliance on Internet materials, discovery requests propounded on Respondent, and an email thread among the USPTO and the parties. 12 TTABVUE.

### B. Respondent's Evidence

- Testimony declaration of Respondent Lewis Davidson, 17 TTABVUE;
- Testimony declaration of Alex Wadsworth, self-identified as a radio personality, 18 TTABVUE.[5]

## IV. Entitlement to a Statutory Cause of Action

Entitlement to a statutory cause of action "is an element of the plaintiff's case in every inter partes proceeding." *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671, 210 L. Ed. 2d 833 (2021); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 82, 211 L. Ed. 2d 16 (2021) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 S. Ct. 1377, 188 L. Ed. 2d 392, 109 USPQ2d 2061, 2067 n.4 (2014)).

---

[5] The testimony declaration of Joseph Weissman, filed at 16 TTABVUE, was stricken by the Board on September 18, 2018. 26 TTABVUE.

To establish entitlement to a statutory cause of action, a plaintiff must demonstrate: (i) an interest falling within the zone of interests protected by the statute and (ii) a reasonable belief in damage proximately caused by the registration or continued registration of the mark. *Spanishtown Enters.*, 2020 USPQ2d 11388 at *1 (citing *Corcamore*, 2020 USPQ2d 11277 at *4). *See also Empresa Cubana*, 111 USPQ2d at 1062; *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (TTAB 1982).

As a direct competitor of Respondent, 11 TTABVUE 10-11, who asserts a Section 2(d) claim on which likelihood of confusion is conceded and only priority is at issue, Petitioner has an interest in canceling Respondent's registration. *See, e.g., Books on Tape, Inc. v. Booktape Corp.*, 836 F.2d 519, 5 USPQ2d 1301, 1302 (Fed. Cir. 1987) (finding competitor has standing because it has an interest in the outcome beyond that of the general public); *Peterson v. Awshucks SC, LLC*, 2020 USPQ2d 11526, *6 (TTAB 2020) (entitlement to a statutory cause of action found where petitioner and respondent are competitors).

Petitioner's interest is squarely within the zone of interests protected by the statute and he holds a reasonable belief that damage is proximately caused by the continued registration of Respondent's mark. Petitioner has established his entitlement to a statutory cause of action under the Trademark Act, 15 U.S.C. § 1051 et. seq.

## V. Likelihood of Confusion

Both Petitioner and Respondent are selling comic books under the mark CAPTAIN CANNABIS, which also serves as the name of a fictitious character. Character names are registrable as trademarks where the character name is perceived by the purchasing public as a mark which identifies and distinguishes the source of goods or services. *See, e.g., In re Paramount Pictures Corp.*, 213 USPQ 1111 (TTAB 1982) (television character names determined to serve as trademarks for decalcomanias); *In re Fla. Cypress Gardens, Inc.*, 208 USPQ 288 (TTAB 1980) (designation consisting of name of clown is registrable for entertainment services despite fact that name also identifies a fictitious character played by performers in applicant's shows); *cf. In re DC Comics, Inc.*, 689 F.2d 1042, 215 USPQ 394 (CCPA 1982) (drawings of fictional comic characters held to function as trademarks for toy doll figurines of such characters).

The parties do not dispute that the term CAPTAIN CANNABIS is a distinctive trademark as well as the name of a character. Nor do they dispute that contemporaneous use of their respective marks would likely cause confusion. Petitioner states that "neither party truly disputes likelihood of confusion," 43 TTABVUE 6, and Respondent agrees that "Petitioner cannot possibly prove any likelihood of confusion [only because Petitioner] has not and cannot carry its burden to establish priority of use." 47 TTABVUE 25. Accordingly, the only issue in dispute under Trademark Act Section 2(d) is priority.

To establish priority on a likelihood of confusion claim brought under Trademark Act Section 2(d), 15 U.S.C. § 1052, Petitioner must prove that, vis-à-vis Respondent,

he owns "a mark or trade name previously used in the United States . . . and not abandoned. . . ." Trademark Act Section 2(d). Petitioner must establish his priority by a preponderance of the evidence. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1848 (Fed. Cir. 2000); *Giersch v. Scripps Networks Inc.*, 90 USPQ2d 1020, 1023 (TTAB 2009) ("In a case involving common-law rights, 'the decision as to priority is made in accordance with the preponderance of the evidence.'") (citing *Hydro-Dynamics*, 1 USPQ2d at 1773).

Because Petitioner does not own an existing registration upon which he may rely for purposes of a Section 2(d) likelihood of confusion analysis, Petitioner must establish his proprietary rights in the CAPTAIN CANNABIS mark before any date upon which Respondent may rely. Petitioner may establish such rights through prior actual trademark use or through prior use analogous to trademark use, such as use in advertising brochures, trade publications, catalogues, newspaper advertisements and Internet websites that created a public awareness of the designation as a trademark identifying Petitioner as the source of the relevant goods. *See* Trademark Act Sections 2(d) and 45, 15 U.S.C. §§ 1052(d) and 1127; *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002) (proprietary rights in the asserted mark may arise from "prior use analogous to trademark or service mark use, or any other use sufficient to establish proprietary rights"); *Cent. Garden & Pet Co. v. Doskocil Mfg. Co.*, 108 USPQ2d 1134, 1145 (TTAB 2013) ("The analogous use doctrine allows a party to claim priority as of when it is established that the mark is associated in the mind of the consumer with a source for the goods.").

10

**A.      Has priority through analogous use been properly pleaded?**

Although the parties make no mention of the issue, we have long held that reliance on priority through analogous use must be pleaded, *see Cent. Garden & Pet Co.*, 108 USPQ2d at 1142 (citing *Fair Indigo LLC v. Style Conscience*, 85 USPQ2d 1536, 1537-38 (TTAB 2007) (discussing sufficiency of analogous use pleading). In his amended petition to cancel, Petitioner claimed priority based on his alleged

> common law usage of the CAPTAIN CANNABIS trademark in U.S. interstate trade since at least January 25, 1999 when [Petitioner] engaged in sales activities at the NATPE trade fair in New Orleans, Louisiana and *bona fide* commercial trade in Comic Books starting September 25, 2006 by way of direct sale of a 420/Captain Cannabis comic book to a customer in the state of Florida.

9 TTABVUE 9 (Amend. Pet. for Canc. ¶ 41). Petitioner also claimed priority based on his alleged "sales and marketing activities through his CAPTAINCANNABIS.COM web portal since April 22, 1999." *Id*. (Amend. Pet. for Canc. ¶ 42).

We find these statements sufficient to allege Petitioner's analogous use priority claim. As stated, Petitioner claims 1999 as the date he was engaged in "sales activities," which is use analogous to trademark use; he also pleads "bona fide commercial trade" in 2006 and clarifies that this was "by way of direct sale," which would be, if proven, actual trademark use. Petitioner also relies on marketing activities, and "even before proper trademark use commences, advertising or similar pre-sale activities may establish priority if they create the necessary association in the mind of the consumer." *Central Garden & Pet Co.*, 108 USPQ2d at 1142. Petitioner has thus sufficiently put Respondent on notice that he intends to rely on

both use analogous to trademark use as well as actual trademark use. *See* Fed. R. Civ. P. 8(e)(1); *see also Scotch Whisky Assoc. v. U.S. Distilled Prods. Co.*, 952 F.2d 1317, 21 USPQ2d 1145 (Fed. Cir. 1991) (under the simplified notice pleading of the Federal Rules of Civil Procedure, the allegations of a complaint should be construed liberally so as to do substantial justice); *Fair Indigo*, 85 USPQ2d at 1538 ("The elements of each claim should be stated concisely and directly, and include enough detail to give the defendant fair notice."); *Harsco Corp. v. Elec. Scis. Inc.*, 9 USPQ2d 1570, 1571 (TTAB 1988) (since function of pleadings is to give fair notice of claim, a party is allowed reasonable latitude in its statement of its claims).[6]

## B.    Respondent's Priority Date

Because a presumption of validity attaches to Respondent's involved registration, Davidson is entitled to rely on the April 2, 2014 filing date as his date of constructive first use. *Cent. Garden & Pet Co.*, 108 USPQ2d at 1140 ("when an application or registration is of record, the party may rely on the filing date of the application for registration, *i.e.*, its constructive use date"); *Syngenta Crop Prot.*, 90 USPQ2d at 1119

---

[6] Even if we found Petitioner's allegations insufficient, we believe the issue has been tried by implied consent. Fed. R. Civ. P. 15(b)(2). For example, Respondent acknowledges that Petitioner alleges CAPTAIN CANNABIS artwork appeared on his website in 1999 but argues that "the existence of such artwork standing alone does not establish use of the artwork as a trademark at the website." 47 TTABVUE 23. Also, Petitioner testified that he sold a copy of his "420" comic book in September 2006, 11 TTABVUE 7; Respondent argues that even if true, it did not bear the CAPTAIN CANNABIS mark. 47 TTABVUE 24. "While the question [would be] a very close one we find that the issue was tried by implied consent, and we therefore consider [Petitioner's] analogous use theory." *Cent. Garden & Pet Co.*, 108 USPQ2d at 1142.

("applicant may rely without further proof upon the filing date of its application as a 'constructive use' date for purposes of priority").

However, Davidson asserts an earlier date for priority. Davidson seeks to establish "2013" as Respondent's date of first use in commerce. To this end, Davidson testified that:

> I initially indicated a first-use in commerce date of October 2, 2014 for my "Captain Cannabis" trademark based on a misunderstanding on my part regarding the requirements for use in interstate commerce. In reality, the first sales of my "Captain Cannabis" comic books under the "Captain Cannabis" mark were in 2013.

17 TTABVUE 4 (Davidson Decl. ¶ 17).

When a registrant seeks "to prove a date of first use earlier than the date alleged in its application for registration ..., its proof of that earlier date must be 'clear and convincing.'" *Hydro-Dynamics Inc. v. George Putnam & Co. Inc.,* 811 F.2d 1470, 1 USPQ2d 1772, 1773 (Fed. Cir. 1987) (dates of first use earlier than that alleged in the application is a change of position from one "considered to have been made against interest at the time of filing the application," and therefore requires enhanced proof); *see also Stanspec Co. v. Am. Chain & Cable Co.,* 531 F.2d 563, 189 USPQ 420, 424 n.10 (CCPA 1976) ("An amendment to a registration to claim earlier dates of first use amounts to an enlargement of a registrant's rights. Such a registrant has a heavy burden of proof in attempting to establish a date of first use prior to that stated in its registration.") (internal citations omitted); *NT-MDT LLC v. Kozodaeva,* 2021 USPQ2d 433 (TTAB 2021) (motion to amend dates of first use denied where registrant's proof was not clear and convincing).

To support the claimed 2013 date, Davidson testified that he "sold some copies of my 'Captain Cannabis' comic books personally in 2013." 17 TTABVUE 3 (Davidson Decl. ¶ 13). Alex Wadsworth testified that he purchased a CAPTAIN CANNABIS comic book from Davidson in 2013. 18 TTABVUE 2 (Wadsworth Decl. ¶ 2). A copy of the cover of the comic book Wadsworth attested to purchasing was attached to his Declaration as Exhibit 1 (18 TTABVUE 3):



Neither Respondent nor Davidson supplied an invoice or receipt demonstrating this alleged sale to Wadsworth or of any direct sales allegedly made in 2013.

Respondent's only receipts come from 2014, in the form of two receipts that fail to identify the items allegedly sold except by unintelligible "deposit ID" numbers. Whether these reflect sales of comic books bearing the artwork shown above, or that displayed below is unclear:[7]



---

[7] This artwork accompanied Respondent's statement of use, and was properly rejected as failing to show use of CAPTAIN CANNABIS in a trademark manner. Trademark Act Sections 1, 2 and 45, 15 U.S.C. §§1051-1052, 1127. After this specimen was rejected, Respondent filed as a substitute specimen, a copy of the cover depicted in Exhibit 1 to the Wadsworth declaration.

The only other submission allegedly supporting Respondent's earlier 2013 claimed date of first use is an invoice from a printer for printing "The Cosmic Crusaders-Reboot-Comic." 17 TTABVUE 8. The invoice does not mention CAPTAIN CANNABIS, and it is unclear if and how the term was used in the referenced "Reboot-Comic." The invoice thus has minimal probative value.

When the smoke clears, the above evidence is not clear and convincing proof that Respondent's first use of its mark on a comic book was in 2013 rather than 2014. Respondent has not established that it is entitled to a date of first use earlier than April 2, 2014.[8]

## C.    Petitioner's Priority Date

As noted above, "even before proper trademark use commences, advertising or similar pre-sale activities may establish priority if they create the necessary association in the mind of the consumer." *Cent. Garden*, 108 USPQ2d at 1142.

> It is well settled that one may ground one's opposition to an application on the prior use of a term in a manner analogous to service mark or trademark use. Such an "analogous use" opposition can succeed, however, only where the analogous use is of such a nature and extent as to create public identification of the target term with the opposer's product or service.

*T.A.B. Sys. v. PacTel Teletrac,* 77 F.3d 1272, 37 USPQ2d 1879, 1882 (Fed. Cir. 1996). The theory under which use analogous to trademark use can provide a party with priority over another user of the same mark further requires that actual trademark

---

[8] Even had we found "2013" to be Respondent's date of first use, such a finding would not change the results in this case.

use must follow the analogous use within a commercially reasonable period of time. *Dyneer Corp. v. Auto. Prods., plc*, 37 USPQ2d 1251, 1255 (TTAB 1995) ("With use analogous to trademark use, the proper inquiry generally is whether any delay between such use and actual, technical trademark use is commercially reasonable.").

To prove prior analogous use, Petitioner need not submit survey evidence or other direct evidence of the consuming public's identification of the CAPTAIN CANNABIS mark with Petitioner as the source of comic books or related goods such as DVDs and animated videos. "Instead, the fact finder may infer the fact of identification on the basis of indirect evidence regarding the [Petitioner's] use of the word or phrase in advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications." *T.A.B. Sys.,* 37 USPQ2d at 1881. While the "activities claimed to constitute analogous use must have substantial impact on the purchasing public," *id.* at 1882, that does not mean proof is required of "a fixed percentage, like 20%, much less 51%, of the potential customers must have formed the required 'prior public identification.'" *Id.* at 1883.

Thus, Petitioner may establish his priority by showing that he has used the CAPTAIN CANNABIS mark in the United States in a manner analogous to trademark use sufficient to create an association in the mind of the relevant consumers between the mark and the goods, followed by actual trademark use of the mark within a "commercially reasonable time." *Dyneer Corp.*, 37 USPQ2d at 1255.

### 1.    Petitioner's Pre-sales Activities

Petitioner testified that he "created a costumed superhero character and comic book titled CAPTAIN CANNABIS" during the 1970s and obtained a Canadian

copyright in 1977 for the "unpublished Literary and Artistic (comic book) titled CAPTAIN CANNABIS." Andrusiek Aff. ¶ 2; Annex. 15 (11 TTABVUE 6). The cover of the work appeared as follows:



11 TTABVUE 16.

Following registration of the copyright in Canada, Petitioner attended a trade show of the National Association of Television Program Executives (NATPE) in New Orleans in 1999. There, he promoted CAPTAIN CANNABIS by means of a promotional flyer distributed at the trade show. Andrusiek Aff. ¶ 3; Annex. 17 (11 TTABVUE 6). According to the flyer distributed at the event, CAPTAIN CANNABIS was the main character in an adult animated series that was "in development." Annex. 17 (11 TTABVUE 20):

**Captain Cannabis**

Cross your local super-hero with an aging rock and roll roadie and you get Captain Cannabis. This adult animated series following the exploits of Halburt Lighter as he stumbles from one disaster to the next.

Audience: Adult          Packaging: Animated series - 26 x 1/2 hour

Also in 1999, Petitioner registered the domain name <captaincannabis.com>. He testified that he has "always been the registered owner." Andrusiek Aff. ¶ 4 (11 TTABVUE 7). Petitioner operates a website at this address that displays the mark "to promote and sell [Petitioner's] CAPTAIN CANNABIS products." *Id.*

Petitioner testified that "on October 12, 2006, I printed 5000 copies of the first CAPTAIN CANNABIS comic book in the series titled "420-001" with oKee.comX (okee.com) publisher." Andrusiek Aff. ¶ 4 (11 TTABVUE 7). On rebuttal, Petitioner testified that "[i]n 2006, I published a new issue of the Captain Cannabis comic series, titled "420" (the "420/CAPTAIN CANNABIS" comic book)." Corrected Andrusiek Rebuttal Decl. ¶ 18; Ex. 5 (39 TTABVUE 5).

The front cover of the comic book was included within Exhibit 5 to Petitioner's rebuttal testimony declaration. The words CAPTAIN CANNABIS do not appear on the front cover of the comic book, 39 TTABVUE 27, which is depicted below:



In addition, within Exhibit 5 to Petitioner's rebuttal declaration and included as part of Annexure 22 to Petitioner's main testimony affidavit, are copies of a page from within the comic book and the back cover of the comic book. On the back cover appears

a reference to "Captain Cannabis" as the main character of the story, and on the inside page before the back cover, "Captain Cannabis" is referred to as the title of the "precursor to '420'" (i.e., the comic book copyrighted in 1977). The back cover at 11 TTABVUE 31 and the inside page before the back cover at 11 TTABVUE 30 follow.

- **Back cover**:



"420" creator Verne Andru found his calling when he met the crew from Captain Canuck Comics at a high school "career day." He quickly became the studio pest, dropping by weekly to show off his latest creations, including "420's" star attraction, Captain Cannabis.

His career got a boost with his first paid job - cel painting on "Blowhard," a National Film Board animated short. This was followed by animation assignments for Hanna Barbera's Saturday morning lineup. At the same time, he continued working in comics, doing covers for Charleton, ink and colour on Captain Canuck and illustrating stories for the independently published Phantacea.

During a feature assignment on Nelvana's "Rock and Rule," he worked with a leading special effects team and became intrigued with the opportunities computers held for fantasy creators. Upon completing that project he attended college, graduating on the honour role a few years later as a computer systems specialist.

Verne was early to apply the technology as it came available. Desktop publishing replaced traditional typesetters. He pioneered digital paint for location and character colour styling on television series work. This was followed by a state-of-the-art desktop animation system he used to produce a range of animations for web and broadcast, including the highly successful Kid's Club commercial spots for Swedish furniture retailer, IKEA.

Verne can be found on the web at www.VerneAndru.com.

VERNE SIGNATURE SERIES™

# PREPARE TO BE AMAZED!



When an aging rock-n-roll roadie happens across a neurotic ET with a stash of cosmic pot, he finds himself transformed into Captain Cannabis – a reluctant "hero" who must learn how to use his new superhuman powers to stop a crazed global elite and their "machine of death" from turning Earth into the ultimate PRISON PLANET.

### "420" IS A FRESH TAKE ON SCI-FI

Join veteran animator and comic book artist Verne Andru, as he spins a tale that will make even the most jaded conspiracy theorist blush. 30 years in the making, "420" mixes highbrow comedy and adventure with the rough and tumble sensibilities of the wrong side of the tracks. Down-and-out roadie Halburt "Hal" Lighter finds himself tossed into the middle of an extraterrestrial turf war over the planet Earth, where the entire future of the human species is at stake. Hal and his secret desire Marion befriend the messianic alien oKee, much to the dismay of the Vice President of the United States who is working in collusion with The Supreme One – evil lord of another alien race.

### "420" HAS A UNIQUE VOICE, ONE THAT IS FRESH AND EXUBERANT

While principally a science fiction story, "420" successfully mixes up its genres. It is a hybrid of science fiction and dark comedy/drama. The story is fun and the characters are great answers to the clichés of the genre, adventuring in an inspired universe. More importantly, Verne Andru has a truly original voice and the story is a unique mix of science fiction, dark comedy and gritty realism.

### "420" IS A MULTI-MEDIA EXTRAVAGANZA

"420" was designed from the outset as a multi-media experience. Verne uses his vast well of experience in film, print and the web to craft an entertainment extravaganza that is second-to-none.

Written as a feature-length film, "420" unfolds over 13 chapters. Storyboards and book pages are prepared simultaneously, ensuring continuity between media. From these, Verne draws detailed animation layouts that appear first as black and white "webisodes" [www.oKee.com and www.CaptainCannabis.com]. Once all a chapter's layouts are polished, they are given a colour treatment then published in an illustrated book series. When all 13 are finalized, so will the artwork to produce the "420" feature-length animated film. This is the first time web, print and film are seamlessly integrated into one of the most unique multi-media experiences ever created.

**WEBISODE VIEWING**



**www.oKee.com :: www.CaptainCannabis.com**

ISBN 0-9738837-0-7

$9.95€

Verne and 420 logos are trademarks of Verne Andru. ©Copyright 1976-2006, Verne Andru. All rights reserved. No part of this work may be reproduced or used in any form or by any means - including but not limited to graphic, electronic, or mechanical including photocopying, recording, taping, or information storage and retrieval systems - without written permission of the publisher, oKee comX.

First printing - October 2006.

Published and printed in the Dominion of Canada - MMVI

Cancellation-92064830-Petitioner Testimony - 000084

Affidavit of Petitioner Laverne John Andrusiek - Cancellation No. 92064830 / 26

- **Inside page:**

# 420 :: THE STORY BEHIND THE STORY

The book you're reading is part of a larger story that's been many years in the making. Raised during the 1960's and weaned on such works as Fritz the Cat, The Fabulous Furry Freak Brothers, Harold Hedd and Cheech and Chong, I naturally gravitated to the "fringier" side of life when it came time to develop my own material. My first original work, and precursor to "420," was a short, black and white comic titled "Captain Cannabis." Truth be told, I created Captain Cannabis as a dark counter-balance to the goody-two-shoes Captain Canuck character my "mentors" George Freeman and Jean-Claude St. Aubin were working on.

Sensing I had stumbled onto something good, I filled out the requisite forms, and filed for a copyright. A few months later I received a certificate from the copyright office for a literary work titled – yes folks – "Captain Cannabis." Unnoticed by me at the time – actually it held no significance in popular culture of the 60's and 70's I was aware of – was the fact that the certificate is dated April 20, 1977.

Today, of course, popular culture holds April 20 in particularly high esteem. April is the 4th month of the year making April 20, numerically speaking, 420. April 20 at 4:20 PM is known as the "pot-smokers' holiday," the "hippie New Year," "national smoke time," "national pot-smoking day," "the holiday," "pot appreciation day," "the ultimate session," or "a day of tribute to the scene." While making no claim to originating the 420 term, my Captain Cannabis copyright certificate is one of the oldest documented connections between April 20 and cannabis that I am aware of. That reason alone made it a title befitting the Captain Cannabis "origin" story.

It took another 20 years before I set about to realize a story worthy of the character I had created. A well know axiom in writers circles holds that there are no new stories, just the retelling of old. I was determined to scour the earth to disprove this maxim. At the very least I wanted to find a story that hadn't been told in a long enough time to at least be interesting. I spent the better part of 5 years researching everything from history to law to linguistics to music to politics to religion. The bibliography exceeded 275 books before I stopped keeping track.

I'm pleased to say I believe I've accomplished my objective. "420"

is the first part of a story being told through a series of feature films. It follows the trials and tribulations of the evolution of man – not the evolution of the physical shell we equate with self, but the evolution of our consciousness that inhabits and animates it during its cosmic journey.

Prior to 500 BCE, our forefathers viewed life and their place in it far differently from current Western culture. There was an understanding that material life was transitory and the "holy grail" of "immortality" was attainable given the proper training and requisite preparation. Training was given through a complex system of "mystery schools." They maintained a tradition of esoteric knowledge that was passed from generation to generation. This important light was all but extinguished when early "Christian" zealots destroyed the schools, killed the practitioners and burned, destroyed or spirited away the written teachings and records. Some of the traditions have been maintained in the Eastern schools of thought, particularly Pantheism, Sufism and esoteric Buddhism to which the Falon Gong claims its ancestry.

The Ancients maintained there was only ONE – a singular consciousness from which all else is both a part of and separate from. While time and space are maya [illusion], they provide a mechanism for isolation and individuation from the ONE. Some schools call this ONE "god," while I prefer the less religiously tainted, and more descriptively accurate, handle of "The Universal Consciousness" [TUC].

Similar to the way light dissipates the further it is from its source, instances of individuated consciousness become increasingly fragmented the further they "fall" from their "Edenistic" bliss of communion with TUC. The levels of fragmentation are similar to strata that are sometimes referred to in terms of "bodies." We are all familiar with the physical body we inhabit on a daily basis and the etheric body we inhabit in our dream state but are unaware of our "mental" body where our consciousness is currently resident. These bodies are similar to the Id, Ego and Super-Ego coined in modern psychology – Carl Jung being particularly "esoteric" in his leanings.

You can visualize these strata by studying the following: "a higher dimension sees all lower simultaneously and equally." In other words, if you are outside a fishbowl you can see and describe it in its totality. Conversely, if you are inside a fishbowl [dimension] it is impossible for you to see and describe what the fishbowl [dimension] looks like from the outside. Software programmers, in order to create the illusion of 3 dimensional worlds found in today's motion pictures and video games, use a software "engine" that is a

21

Cancellation-92064830-Petitioner Testimony - 000083

Affidavit of Petitioner Laverne John Andrusiek - Cancellation No. 92064830 / 25

According to Petitioner, "[b]y 2006, internet retailer Amazon.com had become established; Amazon.com listed my CAPTAIN CANNABIS 420 comic book (420-001)

placing their first of many orders on September 18, 2006." Andrusiek Aff. ¶ 7 (11 TTABVUE 7). Petitioner submitted copies of two shipping orders, showing shipments of four comic books to Amazon.com.kydc, Inc. in Lexington Kentucky; one is dated September 18, 2006 and the other February 27, 2007. Andrusiek Aff. ¶ 7; Annex. 24 (11 TTABVUE 35-36). Petitioner testified that sales through Amazon.com continued until 2017. Andrusiek Aff. ¶ 7 (11 TTABVUE 7).

Petitioner also submitted additional evidence of sales of the comic book. Petitioner submitted shipping records for a sale of one comic book in the United States on September 25, 2006, to a customer in Florida. Andrusiek Aff. ¶ 8; Annexs. 25-6 at 37-40 (11 TTABVUE 7). Petitioner submitted a copy of a statement from Jim McPherson of Phantacea Publications, asserting that he has a copy of the comic book "dated October 2006" that Petitioner "was selling at the time." Annex. 39 (11 TTABVUE 79). In March 2009, a "420-001 Book/DVD Bundle" was sold to a customer in Brooklyn, New York. Andrusiek Aff. ¶ 9; Annex. 26 (11 TTABVUE 42). That customer referred to the goods as "Captain Cannabis (420) + DVD" in his handwritten order. Andrusiek Aff. ¶ 9; Annex. 26 (11 TTABVUE 44).

Petitioner also attests to having utilized social media platforms since 2010:

> In 2010 I started moving CAPTAIN CANNABIS into social media in a bigger way first on MySpace then Facebook and others. Attached hereto and marked Annexure 42 is a November 17, 2016 screen shot I took from my CAPTAIN CANNABIS Facebook page found open to the public at HYPERLINK http://www.facebook.com/pages/Captain-Cannabis/ 131856846871529 www.facebook.com/pages/Captain-Cannabis/131856846871529.

Andrusiek Aff. ¶ 17; Annex. 42 (11 TTABVUE 85), which is displayed below:



Petitioner testified that on "October 12 and 13, 2013 I attended the APE (Alternate Press Expo) comic convention in San Francisco where I sold copies of my CAPTAIN CANNABIS 420 comic books." Andrusiek Aff. ¶ 15 (11 TTABVUE 9). Jim McPherson confirms that Petitioner and he "shared the Phantacea table at the APE (Alternative Press Expo) convention" and that Petitioner sold copies of the comic books at the convention. 11 TTABVUE 79. "I also told potential customers looking for creator signatures or to discuss the Captain Cannabis character with him when he would be back." *Id.*, Exhibit 39. Information as to the number of attendees and number of copies of the comic books that may have been sold at the convention was not provided.

### 2. Have Petitioner's Pre-sales Activities Created the Necessary Association in the Mind of the Relevant Consumer?

As noted, a petitioner's claim of priority based on "analogous use" can succeed only where the analogous use is of "such a nature and extent as to create public

identification of the target term with the [petitioner's] product or service." *T.A.B. Sys.*, 37 USPQ2d at 1882. Petitioner contends that he is well-known within the college and university market, as well as with general comic book enthusiasts. "Over the years, magazines, radio stations and podcasts have repeatedly featured me in articles and interviews as the creator of CAPTAIN CANNABIS and my 420 comic book as a CAPTAIN CANNABIS comic book." Andrusiek Aff. ¶ 9 (11 TTABVUE 7). In support, Petitioner testified about the following media attention garnered by Petitioner before 2014:

- February, 2007: Florida podcaster known as "Q's House" interviewed Petitioner; the resulting interview was broadcast into Florida over the Internet. An announcement of the interview appeared at http://qshouse.slackertown.com/?m=20070227&cat=4, wherein Petitioner was described as "the George Lucas of the comic world":[9]

---

[9] Andrusiek Aff. ¶ 9; Annex. 28 (11 TTABVUE 50).



- February 2007: High Times Magazine published a short article about Petitioner, depicted below.[10] Petitioner states that he "understand[s] their monthly circulation is around 236,000."

---

[10] Andrusiek Aff. ¶ 10; Annex. 26 (11 TTABVUE 8, 52).



- May 21, 2007: Radio Station CJSF's "The Interview Show" broadcast an interview with Petitioner; copy of the promotion "they distributed for that show citing me 'creator of CAPTAIN CANNABIS' [that] I saved from http://www.cjsf.ca/index.php" is depicted below:[11]

---

[11] Andrusiek Aff. ¶ 11; Annex. 30 (11 TTABVUE 8, 54).



- June 2011: Culture Magazine interviewed Petitioner, which "resulted in a cover-story article and interview of [Petitioner] discussing CAPTAIN CANNABIS."[12] The article credits Petitioner for being the creator and

---

[12] Andrusiek Aff. ¶ 12; Annex. 33 (11 TTABVUE 8, 58-60).

writer of CAPTAIN CANNABIS. Petitioner states, "I understand they have 500,000 monthly circulation."



Although there is no record evidence of the size of the comic book market or number of marijuana consumers in the United States at the time, both parties seem to be directing their marks to these same niche communities.[13] The evidence attached

---

[13] Although marijuana remains a controlled substance at the federal level, *see, e.g., In re Stanley Bros. Soc. Enter., LLC,* 2020 USPQ2d 10658 (TTAB 2020), its possession and recreational use has been legalized recently by a number of states. However, at the time that Petitioner engaged in his pre-sales activities, the possession and recreational use of marijuana was not only federally prohibited, but illegal under most state laws. A study by an expert panel of the Department of Commerce's National Highway Safety Administration (https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/expert_dwi_panel.pdf, last accessed

to Petitioner's affidavit suggests that Petitioner's CAPTAIN CANNABIS mark is reasonably well-known within these communities, even if the numbers are not large in absolute terms, and was reasonably well-known prior to Respondent's priority date. By that date, Petitioner's mark had received regional and national attention in niche publications and media, and Petitioner had promoted its mark on a national level, including through trade shows, social media, and the Internet. We find that the evidence considered in its entirety establishes that Petitioner garnered sufficient notoriety from his pre-sales activities to support a finding that his analogous use "is of such a nature and extent as to create public identification of the target term with the [petitioner's] product." *T.A.B. Sys.*, 37 USPQ2d at 1882.

### D. Did Petitioner use the mark CAPTAIN CANNABIS on comic books in the United States within a reasonable time?

The second prong of the test for finding analogous use sufficient to support priority requires that the analogous use be followed up within a reasonable time frame by actual trademark use. To show that he used the CAPTAIN CANNABIS mark within a commercially reasonable period of time following his use analogous to trademark use, Petitioner filed evidence of such technical trademark use from 2016 and 2017. Petitioner took a screenshot of his YouTube channel, and attests:

> On February 25 2007 I started posting the instalments [sic] of my "CAPTAIN CANNABIS in 420" story on my Youtube channel, HYPERLINK "http://www.Youtube.com/

---

on August 31, 2022) stated that in 2016 four states and the District of Columbia had legalized marijuana for recreational use. From this we can reasonably infer that marijuana was not widely consumed legally at the time that Petitioner was promoting "Captain Cannabis" and that the "market" for marijuana-related goods and services was probably relatively small, and surely smaller than it is today.

verneandru" www.Youtube.com/verneandru, and have posted updates as they are available. Attached hereto and marked Annexure 41 is a screen-shot I saved November 6, 2016 of my Youtube channel displaying the completed "CAPTAIN CANNABIS in 420" story.

Andrusiek Aff. ¶ 16; Annex. 41 (11 TTABVUE 9, 83). That screenshot appears below:



The text under the caption titled "Published on Sep 22, 2014" (pointing arrow added to show placement) reads: "Complete animatic of the first [and a bit] storyboard build from the original Captain Cannabis 420 script. This is a rough sketch of the film used to make the story and editing decisions that went into the script rewrite." 11 TTABVUE 83.

On May 1, 2017, Petitioner took a screenshot of his website that he testified displays a copy of the cover of Petitioner's movie script. Andrusiek Aff. ¶4; Annex. 19 (11 TTABVUE 7, 24):



Under Notice of Reliance, Petitioner submitted the following:

**1.** **Amazon "Author Page" listing for Petitioner dated 12/16/2017 (www.amazon.com/author/verne).** 12 TTABVUE 10-11:





**2.** **IMDb's (Internet Movie Database) "Verne Andru" page December 16, 2017 (www.imdb.com/name/nm3252989).** 12 TTABVUE 14:



**3. "Captain Cannabis Celebrates its 40th Anniversary" August 15, 2017 Culture Magazine (U.S.) article by David Edmundson (http://ireadculture.com/captain-cannabis-celebrates-its-40th-anniversary/).** 12 TTABVUE 8:



http://ireadculture.com/captain-cannabis-celebrates-its-40th-anniversary/

LATEST FROM CULTURE | 11, 2017 - Celebrating Snow Sports With Cannabis

ADVERTISE    SUBSCRIPTION    CAREERS    CONTACT    CART

## culture
### MAGAZINE

COVER | NEWS | DEPARTMENTS | FEATURES | REVIEWS | VIDEOS | FLIPBOOK | CONTESTS | MERCH

*You are here: Home / News / Captain Cannabis Celebrates its 40th Anniversary*

# Captain Cannabis Celebrates its 40th Anniversary

by David Edmundson | August 15, 2017



Cannabis in mainstream entertainment may be relatively standard today, but not long ago it was relegated to back rooms as part of the counter culture.

From that bygone era sprung the comic book Captain Cannabis, which is currently celebrating the 40th anniversary of its first issue, titled "Roll Me Another One." The book follows the whacky adventures of Hal Lighter, a hero tasked with protecting Earth amidst an extradimensional war, while trying to protect the love of his life, Marion Jones.

Lighter uses intergalactic weed to transform into the titular Captain Cannabis. Sure it sounds weird, but a lot of comic book powers come from strange places. Shazam, who is an adult aged superhero, got his powers because as a young boy he took a magical subway to a throne room, where a wizened wizard bestowed onto him, not only extraordinary powers, but the ability to go back-and-forth from adult to child when he transforms.

The comic is billed as being "about as far from politically correct as you can get." And it definitely lives up to that moniker. Comic Cook Code be damned, you won't find adventures like this at Marvel or DC. The first issue of the comic, created by Verne Andru, is being reissued with updated artwork to celebrate the milestone.

The parallels between Captain Cannabis and the Green Lantern are too numerous to be a coincidence. Both heroes derive their powers from a mystical source, both play large roles in intergalactic conflicts they never imagined possible and both are motivated by their sense of right and desire to protect the one they love. Readers can only hope that Lighter is better at protecting his beloved, and that she doesn't share the same fate as Green Lantern's (Kyle Rayner) girlfriend Alexandra DeWitt, who was "fridged." No that's not a typo, and DC Comics would love to pretend it didn't happen. Thankfully though, the internet exists and you can read all about it here.

You can pick up the 40th anniversary collector's edition of Captain Cannabis at CaptainCannabis.com.

Petitioner's testimony and documentary evidence demonstrate that he has been selling the "420" comic book that included the CAPTAIN CANNABIS character continuously since 2006 to the present, including during 2013-14, and that by 2017, Petitioner sold comic books under the mark CAPTAIN CANNABIS. We find Petitioner's actual trademark use in 2017 to be within a commercially reasonable period of time following his analogous use in 2013-14 so as to create a "continuing association of the mark" with Petitioner's goods. *Dyneer Corp.,* 37 USPQ2d at 1256.

## VI.    Conclusion

When viewed  as a whole, we find the evidence introduced by Petitioner sufficient to establish that Petitioner used his mark prior to April 2, 2014, first in a manner analogous to actual trademark use, then as an actual trademark.

> [W]hether a particular piece of evidence by itself establishes prior use is not necessarily dispositive as to whether a party has established prior use by a preponderance. Rather, one should look at the evidence as a whole, as if each piece of evidence were part of a puzzle which, when fitted together, establishes prior use.

*W. Fla. Seafood*, 31 USPQ2d at 1663. When all of the testimony and documentary evidence is considered together, it   establishes that Petitioner used the mark CAPTAIN CANNABIS in connection with comic books in a manner analogous to trademark use prior to the April 2, 2014 filing date of Respondent's underlying application, and followed that use by actual trademark use within a commercially reasonable time. Accordingly, Petitioner has shown his priority of use based on his analogous use pre-2014 and his actual trademark use post-2014, and because Respondent has conceded that there is a likelihood of confusion resulting from the

simultaneous use of CAPTAIN CANNABIS in connection with the parties' goods, we find that Petitioner has established its Section 2(d) by a preponderance of the evidence.

**Decision:** The petition to cancel Respondent's registration for the mark CAPTAIN CANNABIS is granted under Trademark Act Section 2(d) and Registration No. 4782920 will be cancelled in due course.[14]

---

[14] In view thereof, we need not and do not reach Petitioner's other pleaded claims. *See TiVo Brands LLC v. Tivoli, LLC*, 129 USPQ2d 1097, 1098 (TTAB 2018) (where judgment entered on dilution claim, merits of section 2(d) claim not reached); *Am. Paging Inc. v. Am. Mobilphone Inc.*, 13 USPQ2d 2036, 2039-2040 (TTAB 1989), *aff'd without opinion*, 17 USPQ2d 1726 (Fed. Cir. 1990) ("Having determined that petitioner is entitled to the relief it seeks based upon its claim pursuant to Section 2(d) of the Lanham Act, we need not address petitioner's claim that registrant has abandoned its rights in the mark AMERICAN MOBILPHONE PAGING and design.").